**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: January 29, 2024.**

**MICHAEL M. PARKER**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRAXCELL TECHNOLOGIES, LLC, | § | CASE NO. 23-60482-MMP |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

OPINION ON MOTION TO DISMISS CASE

I.  **INTRODUCTION**

Before the Court is the *Motion by Judgment Creditors Verizon and T-Mobile to Dismiss Debtor's Chapter 11 Case Pursuant to 11 U.S.C § 1112(b) for "Cause" or Alternatively, Pursuant to 11 U.S.C. § 305 on Abstention Grounds* (ECF No. 46) ("**Motion to Dismiss**") and Debtor's

1

response (ECF No. 63) ("**Response**"). The Court will grant the Motion to Dismiss under 11 U.S.C. §§ 305(a) and 1112(b).[1]

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(a) and 1334(b). Venue is proper under 28 U.S.C. § 1408. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and the Court's power to control cases brought before it. This Opinion serves as this Court's findings of fact and conclusions of law under Federal Rules of Bankruptcy Procedure 7052 and 9014.

## III.    FACTUAL BACKGROUND

This case is the latest skirmish in a series of legal battles between Verizon Wireless, Sprint Spectrum LLC, and T-Mobile USA Inc. (collectively, "**Judgment Creditors**") and Traxcell Technologies, LLC ("**Traxcell**"), which began in 2017 and traversed two federal district courts, a federal circuit court, and two levels of Texas state court review before finally arriving here. The parties' extensive history, described below, informs this Court's ruling.

### a.    TRAXCELL'S BUSINESS

Traxcell is a "non-practicing entity" or, pejoratively, a "patent troll." Like other non-practicing entities, Traxcell has no employees, no non-intellectual property assets, and no manufacturing or service capabilities. Traxcell has not sought (i) debtor-in-possession financing or permission to use cash collateral; (ii) permission to pay prepetition employee debt or create

---

[1] All statutory citations and references are to title 11 of the United States Code, unless otherwise noted.

deposits for utility providers (because it has neither employees nor utilities); or (iii) permission to pay landlords, tax creditors, or critical vendors (because it has none), which is unsurprising given that Traxcell's registered address is a house in Waco owned by a friend of Traxcell's principal, Mark Jefferson Reed ("**Reed**"). Traxcell exists simply to hold and enforce its intellectual property rights through patent infringement litigation, mainly for the benefit of the litigation funding firm AiPi, LLC ("**AiPi**"), the law firm of William P. Ramey, III ("**Ramey**"), and Reed.

Traxcell held eleven patents on cell phone-related technology, all of which except one have now expired. Traxcell values its patent infringement lawsuits at $700 million on its schedules. Traxcell's receiver now appears to own those patents following the imposition of a receivership by a Texas state court.

Since its inception in 2015, Traxcell has only generated revenue through patent infringement litigation and licensing fees. Traxcell receives services and funding for these lawsuits from AiPi and Ramey, who has represented Traxcell since 2015. In return, Ramey and AiPi receive the vast majority of any litigation proceeds and licensing fees obtained by Traxcell (50% to AiPi, 45% to Ramey, and the remaining 5% to Traxcell).[2] According to Ramey, Traxcell has generated about $3 million in litigation proceeds and another $500,000 in licensing fees since its formation. If true, this suggests that after AiPi and Ramey were paid, Traxcell's total net income over the last eight or so years was $175,000 (5% of $3.5 million), or just $21,875 per year on average.

---

[2] Having not been provided with copies of either of these agreements to share proceeds, the Court is uncertain if Ramey or AiPi assert secured claims.

3

### b. LITIGATION HISTORY

In late 2017, Traxcell filed a series of lawsuits in the United States District Court for the Eastern District of Texas, alleging patent infringement against several cell phone companies, including the Judgment Creditors. By April 2020, Traxcell's cases against each Judgment Creditor had been dismissed with prejudice. Subsequently, Judgment Creditors Verizon and Sprint each filed Motions for Attorney's Fees and were awarded $512,661.09 and $805,889.86, respectively (collectively, the "**Fee Awards**"). The Eastern District Judge, adopting the Magistrate Judge's Memorandum Order, found that the Fee Awards were warranted because Traxcell "continued to pursue theories that it knew, or should have known, to be baseless." Order at 3, *Traxcell Technologies, LLC v. AT&T Corp. & AT&T Mobility LLC*, No. 2:17-cv-00718-RWS-RSP (E.D. Tex. Dec. 22, 2022), ECF No. 545. Traxcell appealed the Fee Awards to the Federal Circuit, which upheld them in July 2023. Traxcell then filed a Petition for Writ of Certiorari to the United States Supreme Court, again challenging the Fee Awards.[3]

While the Federal Circuit appeal was pending, the Judgment Creditors domesticated the Fee Awards in a Texas state court. Soon after, Verizon filed a Motion for Turnover and Appointment of a Receiver ("**Turnover Motion**") in Texas state court. The court granted the Turnover Motion on March 7, 2023, appointed a receiver, and ordered that Traxcell transfer to the receiver, among other things, its patents ("**Receivership Order**"). Traxcell's filing of this bankruptcy case stayed Traxcell's appeal of the Receivership Order.

---

[3] The Petition for Writ of Certiorari was denied on January 8, 2024. *Docket Search*, SUPREME COURT OF THE UNITED STATES (Jan. 26, 2024, 10:02 AM), https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/23-574.html.

While Traxcell and the Judgment Creditors were fighting over fees in the Eastern District, Traxcell filed another round of patent infringement suits against Verizon and various other defendants in the United States District Court for the Western District of Texas in December 2020 (collectively, the "**Western District Litigation**"). Judge Albright stayed the Western District Litigation because the Receivership Order appeal made the ownership of the patents unclear, calling into question Traxcell's standing to pursue the litigation. The automatic stay then stayed the Receivership Order appeal, effectively operating as an appellate court stay (without bond) of the Receivership Order appeal and an indirect stay of the Western District Litigation.

### c. TRAXCELL'S BANKRUPTCY CASE

On its schedules, Traxcell's largest creditor is Ramey, with a $1.9 million contingent fee claim, which depends on the successful resolution of the Western District Litigation. Traxcell also lists a debt to AiPi for an unknown amount. Substantially all of Traxcell's debts consist of (i) contingent legal fees owed to Ramey, (ii) litigation funding fees owed to AiPi,[4] and (iii) amounts owed to the Judgment Creditors and judgment creditor Nokia.[5]

In the three months from the petition date until the hearing date on the Motion to Dismiss, Traxcell had not filed a single operative motion other than applications to employ Ramey and Charles Chesnutt.[6] After the Motion to Dismiss had been filed but before it was heard, Traxcell filed a skeletal "placeholder" plan of reorganization without a disclosure statement. ECF No. 69.

---

[4] The Court is highly skeptical of Debtor's failure to quantify what must be one of its largest obligations.

[5] The Court will note that based on evidence submitted at the hearing, Traxcell's schedules (ECF No. 22) (mislabeled "amended schedules") misrepresent the nature of the obligations owed to judgment creditors. The schedules incorrectly label such debt as arising from "Services."

[6] This case was originally filed in the Austin Division and was transferred, *sua sponte*, to the Waco Division of the Western District of Texas by Judge Robinson. ECF No. 8.

On the day of the hearing on the Motion to Dismiss, Traxcell filed a second plan ("**Plan**"), again without a disclosure statement. ECF No. 77. Remarkably, the Plan (i) offers certain expired patents to the Judgment Creditors in satisfaction of their claims, (ii) preserves priority and secured claims of the IRS, which are not identified or quantified in Debtor's schedules, (iii) suggests unsecured claims under $100,000 other than those held by Judgment Creditor Nokia will be paid in full, except claims of AiPi and Hicks Thomas, LLP, which for reasons unarticulated will not be paid at all, and (iv) appears to discriminate between like claims without articulated justification. Under its treatment of "Executory Contracts," the Plan also requires the continued payment of "TEC" without ever defining who or what "TEC" is. Finally, the Plan proposes that Debtor's counsel will receive a priority, secured claim for his fees, notwithstanding the Code's treatment of such fees as administrative expenses of the estate. § 503(b)(2).

The day after the hearing, Traxcell filed its *Motion to Omit Disclosure Statement*, which argues that there is "little reason for a disclosure statement in this case" because Traxcell has no employees, "very little" current income from its only source (patent litigation), and "few assets other than the patents." ECF No. 78. The next day, Traxcell moved to withdraw its *Motion to Omit Disclosure Statement,* ECF No. 79, and a few days later filed a disclosure statement inconsistent with the Plan.[7] ECF No. 83.

---

[7] The disclosure statement indicates (i) Ramey's claim is $265,000, not the $1.9 million alleged in the plan, and (ii) that unsecured creditors "should receive 100%" (despite the Plan explicitly providing otherwise for some unsecured creditors).

## IV.  DISCUSSION

The Judgment Creditors argue that Traxcell's case should be dismissed "for cause" (i) under § 1112(b) as filed in bad faith; (ii) under § 1112(b)(4)(A) because allowing the case to proceed would likely result in "loss or diminution of the estate" and there is no "reasonable likelihood of rehabilitation," or (iii) under § 305(a)(1). The Court finds that Traxcell's case should be dismissed under § 1112(b) as a bad faith filing, for cause under § 1112(b)(4)(A), and under § 305(a)(1).

### a.  DISMISSAL FOR BAD FAITH UNDER § 1112(B)

Section 1112(b) provides that a court shall "dismiss a case under this chapter … for cause." § 1112(b)(1). It also provides a non-exclusive list of scenarios that may constitute cause for dismissal. § 1112(b)(4). Analysis of cause under § 1112(b) is "case-specific, focusing on the circumstances of each debtor" and requires consideration of the totality of the debtor's circumstances. *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 371-72 (5th Cir. 1987).

The Fifth Circuit treats a debtor's bad faith in filing a case as cause for dismissal under § 1112(b). *Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). The *Little Creek* factors include the following hallmarks of bad faith filings:

1. The debtor has no employees, except for the principal(s);
2. The debtor has little or no cash flow;
3. The debtor has no available sources of income to sustain a plan of reorganization or make adequate protection payments;
4. There are only a few unsecured creditors with relatively small claims compared to the secured claims in the case;
5. The case is a two-party dispute between the debtor and a single creditor (or consolidated group of creditors);

7

6.  The debtor's primary asset is about to be sold or transferred, and the debtor has
failed to prevent the sale or transfer in state court.

*Little Creek Dev. Co.*, 779 F.2d at 1073; *see also* **In re McMahan**, 481 B.R. 901, 916

(Bankr. S.D. Tex. 2012) (adding the existence of a two-party dispute as a *Little Creek* factor).

These factors are not exclusive, but the Court finds them instructive in its analysis of the totality

of the Debtor's circumstances.

The Judgment Creditors allege that Traxcell filed this case in bad faith, not to reorganize

its business, but simply to stay the effects of the Receivership Order. In other words, the Judgment

Creditors argue that Traxcell's case serves effectively as a costless appeal bond—its purpose is

only to stall a potentially unfavorable ruling in state court (a receiver taking control of Traxcell's

patents) while awaiting a decision on its Petition for Writ of Certiorari to the United States

Supreme Court (seeking reversal of the Judgment Creditors' Fee Awards).[8] By filing the case,

Traxcell avoids the cost of an appeal bond and circumvents the reason such bonds are required: to

shift some risk of an adverse ruling to the appellant (here, Traxcell).

Although Traxcell's Response was incoherent,[9] for the sake of argument the Court

interprets it to allege a legitimate reorganizational purpose: removing the receivership so Traxcell

---

[8] As noted, between the hearing on this matter and the issuance of this Opinion, the Supreme Court has denied
Traxcell's Petition for Writ of Certiorari.

[9] Traxcell's Response does not directly address any of the Judgment Creditors' arguments in the Motion to Dismiss
and, at times, veers wildly outside the scope of the Motion to Dismiss. For instance, the Response seems to assume
that these issues are before the Court: (i) whether to lift the automatic stay (p. 6), (ii) whether the Court should grant
a TRO against implementing the Receivership Order (p. 7); (iii) whether the Receivership Order should be abrogated
through a writ of mandamus (p. 8); and (iv) whether the receiver appointed under the Order should be joined to the
"proceeding" (presumably the Western District Litigation, a motion from which this section of the Response seems to
have been directly lifted) under FRCP 19 or 25(c) (p. 9). None of these arguments are currently before the Court, and
the Court gives them no weight.

can proceed with its business operations (patent litigation), after which it will pay its creditors through the case.

Applying the *Little Creek* factors to these facts, the Court finds that cause exists under § 1112(b) to dismiss Traxcell's case as a bad faith filing.

### i.  TRAXCELL HAS NO EMPLOYEES BESIDES ITS PRINCIPALS

The first factor asks whether the debtor has non-principal employees. As Reed testified, Traxcell has no employees, and its only managing members are Reed and his wife. A lack of any employees suggests that there is no business to reorganize and thus no good faith reason for being in chapter 11. While there may well be non-employee businesses with a good faith reason to be in bankruptcy, here, this factor favors a finding of bad faith.

### ii.  TRAXCELL HAS NO CASH FLOW

The second factor concerns the debtor's cashflow. Traxcell currently has none and has not had any in the last few years. As Reed and Ramey both testified, Traxcell has historically had only two sources of income: proceeds of patent infringement lawsuits and licensing fees. Traxcell, however, has earned no revenue from either source since at least 2021 and will continue to earn nothing pending the Receivership Order appeal. Its only potential source of income, the Western District Litigation, has been stayed, and most, if not all, of its revenue from licensing agreements has dried up now that its patents have expired. This factor favors a finding of bad faith.

### iii.  TRAXCELL HAS NO INCOME TO FUND A PLAN

The third factor, related to the second, is whether the debtor has income sufficient to fund a plan or make adequate protection payments. Traxcell's only projected source of income for its reorganization is the Western District Litigation, which has been stayed by the Receivership Order appeal and this case. Traxcell does not have the income to pay an appeal bond, much less the ongoing expenses of the estate. Although Traxcell asserts in its schedules that its claims against the Judgment Creditors and other defendants are worth $700 million, the Court finds Traxcell's valuation highly speculative and not supported by credible or admissible valuation testimony. The only witness who testified on the value of the Western District Litigation was Ramey, who is not, and was not at the hearing, qualified as a valuation expert. As proposed contingent fee counsel for Traxcell in the Western District Litigation, Ramey has a vested interest in continuing that litigation at all costs and regardless of the risks to other creditors.  The Court therefore finds the $700 million valuation unsupported by credible or admissible evidence.

Even if Ramey's $700 million valuation were credible, that valuation depends on two highly uncertain contingencies, neither of which was addressed by Ramey in his testimony. Traxcell must (i) overturn the Receivership Order on appeal, and (ii) then prevail on its claims in the Western District Litigation, all without funding. In terms of actual liquidity, Traxcell's schedules reveal just $3,414.68 in cash and accounts—hardly enough to pay the $1.3 million it owes to the Judgment Creditors. Moreover, to be successful, Traxcell would have to confirm a plan that at least two-thirds of its non-insider, unsecured creditor class appear to oppose. This factor favors a finding of bad faith.

### iv.   THE SECURED TO UNSECURED DEBT RATIO IS SEEMINGLY FAVORABLE

The fourth factor concerns the proportion, in both number and value, of the debtor's unsecured debts. In *Little Creek*, the Fifth Circuit illustrated this factor with the example of a debtor filing chapter 11 to protect a single, encumbered tract of real property. *Little Creek Dev. Co.*, 779 F.2d at 1072. A relatively low proportion of unsecured debts tends to indicate bad faith because it suggests the debtor filed in contemplation of a single, large, secured debt. *See, e.g.*, *In re Triumph Christian Ctr., Inc.,* 493 B.R. 479, 494 (Bankr. S.D. Tex. 2013) (finding that this factor favored a finding of bad faith where only 3% of debts were unsecured, with the remaining 97% owed to one secured creditor).

According to Traxcell's schedules, its debts are all unsecured, including those to Ramey and litigation funder AiPi. No evidence was presented about the secured or unsecured nature of the claims of Ramey or AiPi. The Court believes it unusual for such claims to be unsecured. The claims of litigation funders like AiPi are often secured with an interest in the borrower's litigation proceeds. Ali M.M. Mojdehi et al., *Litigation Finance and the Issues It Creates in Bankruptcy*, 37 AM. BANKR. INST. J. 40, 40 (2018). Although Ramey testified that he and AiPi have a combined *95% interest in the proceeds* of Traxcell's patent litigation*,* no documentary evidence of a security interest was presented and it is unclear whether either creditor holds a security interest. The Plan also suggests that the IRS has a secured claim, but no evidence of such claim was submitted. Because neither of Traxcell's funding agreements with Ramey or AiPi are in evidence and the Court has no evidence to the contrary, it will assume the claims of Ramey and AiPi are unsecured and that no IRS secured claim exists. Despite the conflicting information presented to the Court, without evidence of any secured debts, this factor favors a measured finding of good faith.

11

### v. **THIS CASE IS A TWO-PARTY DISPUTE**

The fifth *Little Creek* factor asks whether the case is a two-party dispute. Although this factor was not originally stated in *Little Creek*, bankruptcy courts in the Fifth Circuit have since adopted the existence of a two-party dispute as a *Little Creek* factor.[10] *E.g.*, *In re Triumph Christian Ctr., Inc.,* 493 B.R. at 494; *In re McMahan*, 481 B.R. at 916. Courts routinely dismiss two-party disputes in chapter 11, characterizing them as having been filed in bad faith. *Triumph Christian Ctr.*, 493 B.R. at 495. When considered as a *Little Creek* factor, the characterization of a case as a two-party dispute is given greater weight relative to the other factors. *Id*. The existence of a two-party dispute can be independent grounds for dismissing a case. *In re Turner*, 2022 WL 3363687, at *4 (Bankr. W.D. Tex. 2022); *see also In re Marino*, 2010 WL 519772, at *3 (Bankr. S.D. Tex. 2010) ("This court has generally found cause to dismiss cases in which it appeared that the debtor was attempting to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two-party dispute.").

In its schedules, Traxcell alleges that it owes $3,616,000 to various creditors, the largest single claim being a $1.9 million contingent debt owed to Ramey. Ramey's contingent fee claim, however, will not be paid unless Traxcell prevails in the Western District Litigation. Disregarding Ramey's contingent fee claim along with the remaining contingent, unliquidated, or disputed claims, Traxcell is left with $1,481,000.00 in debts. Of that amount, $1,391,000.00 is owed to the Judgment Creditors, meaning that 94% of all non-contingent claims belong to the Judgment

---

[10] This factor can overlap with the fourth factor, which can also suggest the likelihood of a two-party dispute where a bankruptcy case is filed to stymie or stay the progress of a secured creditor seeking to foreclose against the main collateral of a single-asset debtor, rather than being filed with reorganizational purpose.

Creditors.[11] This case is effectively a two-party dispute, which strongly favors a finding of bad faith.

### vi. THIS CASE WAS FILED TO PREVENT THE SALE OF TRAXCELL'S PATENTS

The sixth factor asks whether the debtor filed bankruptcy to prevent the transfer of its valuable asset(s) (via sale or foreclosure) and had been unsuccessful at preventing such transfer at the state court level. Traxcell seeks to prevent the transfer to a receiver of Traxcell's only valuable assets, its patent infringement lawsuits. Under the Receivership Order, Traxcell's patents are to be sold to pay Traxcell's creditors. Traxcell's attempts to reverse the Receivership Order at the state level have failed. Accordingly, Traxcell appears to have filed this proceeding to obtain the stay of the Receivership Order it could not obtain in state court. It is classic bad faith when a debtor attempts to use a bankruptcy filing to impede and relitigate a matter involving a significant debtor asset, or collective set of significant assets, unfavorably decided at the state court level. *See, e.g., **In re SB Properties, Inc.***, 185 B.R. 206 (Bankr. E.D. Pa. 1995) (dismissing a chapter 11 case under § 1112(b) for bad faith where the debtor, in a two-party dispute, filed bankruptcy to move pending litigation over the liquidation of debtor's only valuable asset out of state court). Because Traxcell appears to have filed bankruptcy mainly to obtain a "second bite at the apple" regarding the Receivership Order, this factor heavily favors a finding of bad faith.

---

[11] All but $1,000 of the remaining debt is attributable to a claim against the Debtor (which has no employees) for allegedly obtaining a fraudulent Paycheck Protection Program loan (a federal government program allowing employers *with employees* to obtain a potentially waivable loan to cover employee wages during employer shutdowns caused by COVID-19).

Taking the totality of the circumstances into account and weighing the ***Little Creek*** factors, the Court finds that there is cause to dismiss the case as filed in bad faith under § 1112(b).

### b.  DISMISSAL UNDER § 1112(B)(4)(A)

Alternatively, the Judgment Creditors argue that Traxcell's case should be dismissed under § 1112(b)(4)(A), which provides that "substantial or continuing loss to or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation" constitutes cause for dismissal. § 1112(b)(4)(A) (emphasis added). The Court agrees, and finds cause also exists to dismiss Traxcell's case under § 1112(b)(4)(A).

### i.  THE ESTATE WILL SUFFER SUBSTANTIAL LOSS IN BANKRUPTCY

To satisfy the first prong of § 1112(b)(4)(A), the estate must suffer either a substantial or continuing loss in the bankruptcy. ***In re M.A.R. Designs & Constr., Inc.***, 653 B.R. 843, 855 (Bankr. S.D. Tex. 2023). This prong is satisfied if allowing the loss to continue by prolonging the case would effectively destroy any prospects of reorganization. ***In re Ozcelebi***, 639 B.R. 365, 384 (Bankr. S.D. Tex. 2022). Additionally, where a debtor "has ceased business operations and liquidated virtually all of its assets, any negative cash flow, including that resulting only from administrative expenses, effectively comes straight from the pockets of creditors and is sufficient to satisfy the first element of § 1112(b)(1)." ***In re M.A.R. Designs & Constr., Inc.***, 653 B.R. at 856.

The Judgment Creditors argue that allowing the case to continue would result in loss to the estate because Traxcell would accrue an unknown amount in attorney's fees and costs from the

14

Western District Litigation and the Supreme Court appeal, thus diminishing the likelihood that the Judgment Creditors will be paid their claims. Additionally, they argue that allowing the case to continue would result in the accrual of attorney's fees through the process of confirming Traxcell's Plan, which the Judgment Creditors have made clear they will contest.[12]

The Court agrees. While Traxcell, as a non-practicing entity, does not have overhead, wages, or other expenses, it is accruing attorney's fees and costs in the bankruptcy. Traxcell is effectively insolvent, with no current cashflow. All but $3,416.83 of its scheduled assets come from the projected value of its patent infringement lawsuits in the Western District Litigation. Under these circumstances, Traxcell's attorney's fees and costs "effectively [come] straight from the pockets of creditors" and establish substantial loss or diminution of the estate under § 1112(b)(4)(A). *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. at 856.

### ii.  THERE IS NO REASONABLE LIKELIHOOD OF REHABILITATION

"The issue of rehabilitation for purposes of Section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) (quoting *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)). In other words, the second prong of § 1112(b)(4)(A) requires the Court to look beyond feasibility of plan confirmation and towards Traxcell's future business prospects.

---

[12] The Judgment Creditors also suggest that a total loss to the estate may occur if the Western District Litigation is allowed to proceed, reaches the merits, and Traxcell's patents are found to be of minimal value or even worthless. While *the risks* of diminished or even no recovery are important considerations, the Court makes no findings on the underlying merits of the Western District Litigation.

The Judgment Creditors argue that Traxcell lacks any realistic prospects of generating income to pay their claim. The Court agrees. As Reed stated at the hearing, Traxcell's only potential source of funding for a successful rehabilitation would come from the Western District Litigation. Given the negative outcome of the Eastern District Litigation, and the fact that Traxcell must first unwind the Receivership Order to even have standing to pursue the Western District Litigation, this Court is not convinced that Traxcell has a reasonable likelihood of rehabilitation. The contingencies that must occur before Traxcell can even fund the Plan, let alone successfully rehabilitate its business, are too many and too remote to be called reasonably likely.

More importantly, the Court does not believe that Traxcell has a business to rehabilitate in the first place. Even if Traxcell could undo the Receivership Order, Reed testified that all but one of the patents Traxcell formerly held have expired. This means that Traxcell's business of filing patent infringement litigation is winding down.[13] It could not enter into licensing agreements on the expired patents post-rehabilitation either, and any such current licensing agreements it has may be unenforceable. Accordingly, the Court finds that the second prong of § 1112(b)(4)(A) has been met, and cause exists to dismiss the case under that provision.

### c. DISMISSAL UNDER § 305(A)

Finally, the Judgment Creditors argue that Traxcell's case should be dismissed under § 305(a)(1). Section 305(a) provides, in relevant part, that the Court, "after notice and a hearing,

---

[13] There is a 6-year statute of limitations on alleged patent infringement, meaning that Traxcell could still pursue litigation on infringement of its expired patents for a limited time, assuming it somehow succeeds in the Receivership Order appeal. 35 U.S.C. § 286. However, Traxcell has presented no evidence that it has, or intends to bring, other pre-expiration patent infringement lawsuits.

16

may dismiss a case under this title … at any time if … the *interests of creditors and the debtor* would be better served by such dismissal" (emphasis added).

Dismissal under § 305(a)(1) is "an extraordinary remedy" that requires the Court to conduct more than a mere balancing of interests. *In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115, 145 (Bankr. N.D. Tex. 2018). Instead, the Court must find that the interests of the debtor and all creditors are better served by dismissal. *In re Eastman*, 188 B.R. 621, 625 (B.A.P. 9th Cir. 1995). Courts have considered these factors in determining whether dismissal under § 305(a)(1) serves the interests of the debtor and creditors:

> (i) the economy and efficiency of administration; (ii) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (iii) whether federal proceedings are necessary to reach a just and equitable solution; (iv) whether there is an alternative means of achieving an equitable distribution of assets; (v) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (vi) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (vii) the purpose for which bankruptcy jurisdiction has been sought. *Id*.

Dismissal under this analysis is much less clear-cut than dismissal under § 1112(b). Even so, the Court finds that the specific facts of this case justify the "extraordinary remedy" of dismissal under § 305(a)(1).

### i. THE ECONOMY AND EFFICIENCY OF ADMINISTRATION

The first factor, the economy and efficiency of administration, considers whether administration of a case in bankruptcy court is needlessly costly or disruptive to the business. Abstention and dismissal may be appropriate where "an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy." *Id*. at 146. By the time Traxcell filed

17

bankruptcy, though, it no longer had a going concern to disrupt. If Traxcell had a functioning "business" (prosecuting the Western District Litigation and appealing the Fee Awards), that business was stopped by the Receivership Order. Importantly, Traxcell was not paying the few debts it had as they came due and was effectively in the process of being liquidated through the Receivership Order. Because the liquidation and distribution of the patents were already set to take place outside the bankruptcy, keeping the case in this Court may hinder the administrative economy and efficiency of the process in place to wind down what remains of Traxcell's business. This factor appears to favor dismissal.

### ii. THE EXISTENCE OF AN ALTERNATIVE FORUM

The second factor asks whether another forum is available to protect the interests of the debtor and creditors, or if there is a preexisting pending state court proceeding. Here, there is both a non-bankruptcy forum that would protect the interests of the Judgment Creditors (the receivership) and a preexisting pending state court proceeding (the Receivership Order appeal). But that is not the end of the inquiry. The Court must also consider whether liquidation and distribution of the patents under the alternative forum is comparatively advantageous to *all* creditors and the Debtor.

The Court finds that the receivership would better serve the Judgment Creditors' interests because (i) Traxcell's articulated dire financial situation and limited resources make its short term survival unlikely, (ii) Traxcell's Plan, which the Judgment Creditors oppose, has a narrow chance of achieving confirmation, and (iii) Traxcell's chances of successfully reversing the Receivership Order and then successfully prosecuting the Western District Litigation appear equally limited and speculative. Under these circumstances, the odds of achieving an equitable distribution to the

18

Judgment Creditors through bankruptcy are slim. Moreover, allowing Traxcell to proceed in bankruptcy would effectively shift the substantial risk of Traxcell's failure in the Western District Litigation onto the Judgment Creditors. A quick receivership sale, by contrast, would provide the Judgment Creditors a more straightforward path to obtaining a distribution than the Plan.[14]

Arguably, the interests of the remaining, non-insider, non-contingent creditors, who collectively hold the relatively minor amount of $90,000 in unsecured claims ("**Non-Judgment Creditors**")[15] may be better protected by the receivership. Unlike some receivership orders, which exclusively favor judgment creditors, the Receivership Order here only directs the turnover of the patents to the receiver without directing the return of the sale proceeds to *only* the Judgment Creditors. This leads the Court to believe that the Non-Judgment Creditors might also be able to seek payment from a portion of any sale proceeds. If the patent litigation claims are as valuable as Traxcell suggests, their sale would net ample funds with which to pay the Non-Judgment Creditors. Traxcell's Plan, by comparison, seeks to pay the Non-Judgment Creditors' claims through litigation, which, in its current posture, is highly uncertain to net any recovery. Even if Traxcell were to succeed in the Western District Litigation, its Plan requires revenue in excess of amounts due to AiPi and Ramey to pay the Non-Judgment Creditors' claims, which the Plan proposes to pay "when due according to their terms." ECF No. 69. No such revenue currently exists, nor is it

---

[14] The sale of the patents could also place a current market value on them. Ramey, who asserts the patents have significant value, could buy them from Traxcell by paying at least the cost of the underlying Judgment and Non-Judgment Creditor claims and then continue to pursue the litigation. If Ramey did so, this would, in a sense, put Ramey's "money where his mouth is," shifting the risk of continued litigation onto Ramey and off the other creditors.
[15] These creditors are Bank of America and the Small Business Administration, which hold an $89,000 claim, and Rob Van Essen, who holds a $1,000 claim.

likely to materialize soon.[16] Thus, it is unlikely that these claims will be paid under the Plan. Of course, payment of the Non-Judgment Creditors' claims is not assured through the receivership either, but after balancing the equities and considering the support of the receivership by Judgment Creditors, the Court believes that the door to recovery is open wider under the Receivership Order than under Traxcell's Plan.

Finally, dismissal under § 305(a) will serve Traxcell's interests. The longer Traxcell remains in bankruptcy, the more of its dwindling estate is siphoned away by its attorney's fees. There is no reasonable likelihood that these expenditures will bear fruit for Traxcell, which has no going concern to preserve and effectively no business to reorganize. *See **In re Danehy Dev. Corp.***, 27 B.R. 727, 728 (Bankr. S.D. Fla. 1983) (finding that the interests of both the debtor and creditors would be better served by dismissal under § 305(a) where "no useful or beneficial purpose is likely to be achieved for the debtor in this court, . . . [the debtor] is certain to bear a substantial expense the longer this case lasts," and "the creditors are being delayed without any corresponding benefits."). Disposing of the patents through the receivership also eliminates Traxcell's obligation to pay the potentially massive contingent claims of Ramey and AiPi. The Court is aware of the risk that dismissing the bankruptcy case and allowing the receivership to proceed could diminish recovery for Traxcell (and may impact recovery for the few Non-Judgment Creditors). Regardless, the choice presented to the Court is essentially this: it may allow Traxcell to remain in bankruptcy to await a speculative recovery in the distant future while its attorneys incur fees which drain what little is left of the estate (a recovery that would trigger payment of Ramey and AiPi), or it may

---

[16] If Traxcell proposed a plan which would fully pay the claims of non-contingent creditors at plan confirmation, the situation might be different because such creditors would not be held hostage by hopeful recoveries for contingent fee claims.

allow the receivership to quickly dispose of Traxcell's patents in a sale which will satisfy the biggest creditor class, the Judgment Creditors, may satisfy the Non-Judgment Creditors, and may provide some recovery for Traxcell (if the patents are as valuable as Ramey claims they are).

The second factor favors dismissal.

### iii.  THE RELATIVE DESIRABILITY OF BANKRUPTCY COURT AS A FORUM

The third, fourth, fifth, and sixth factors all generally concern whether bankruptcy court is comparatively the appropriate, desirable, or efficient forum for distribution to creditors. *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002). As discussed, the receivership is a more appropriate forum for distribution to all creditors, including the Non-Judgment Creditors. Additionally, it would be efficient to allow the receivership, which existed before the bankruptcy, to handle distribution. These factors collectively favor dismissal.

### iv.  THE PURPOSE OF THE DEBTOR'S BANKRUPTCY

The seventh factor concerns the purpose for which the debtor sought bankruptcy protection and is essentially a test of the debtor's good faith. "A significant factor in favor of dismissing a case pursuant to § 305(a)(1) is the absence of a true bankruptcy purpose, particularly where the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor." *In re Efron*, 529 B.R. 396, 406 (B.A.P. 1st Cir. 2015). The Court has already found that Traxcell filed this case in bad faith, mainly to (i) serve as an appeal bond for the (now decided) Writ of Certiorari and the receivership proceeding, and to (ii) relitigate the Receivership Order. This case lacks a reorganizational purpose and is a two-party dispute between Traxcell and the Judgment Creditors. This factor favors dismissal.

21

Having conducted an intensive, fact-based analysis of the above factors, the Court is satisfied that dismissal would better serve the interests of Traxcell and its creditors. The Court therefore finds that the specific facts here justify the "extraordinary remedy" of dismissal under § 305(a).

## V.   CONCLUSION

Traxcell brings before this Court a two-party dispute with the Judgment Creditors with no realistic prospects of rehabilitation or even a business to reorganize. The Court finds cause to dismiss this case as a bad faith filing under § 1112(b) because it is essentially a costless appeal bond for Traxcell's ongoing proceedings, and an attempt to relitigate the Receivership Order.

The Court also finds that cause exists to dismiss this case under § 1112(b)(4) because allowing a debtor with no cashflow and no realistic prospects of rehabilitation to remain in bankruptcy would needlessly diminish the estate to the detriment of creditors.

Finally, the Court finds that dismissal under § 305(a) is appropriate under the specific circumstances of this case. The Court will therefore dismiss Traxcell's case and enter a separate order consistent with this Opinion.

# # #